AO 91 (Rev. 11/11) Criminal Complaint

ORIGINAL

## UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

MAR 1 6 2020

CENTRAL DISTRICT OF CALIFORNIA
BY dj                          DEPUTY

United States of America,

v.

**TIMOTHY KIETH MOORE, and
JESSE DANIEL TALAUGON,**

Defendants.

Case No.  **2:20-MJ-1185**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 20, 2020, in the county of Los Angeles in the Central District of California,

the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute a controlled substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

**GARRETT FRASER, HSI SPECIAL AGENT**
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  MAR 1 6 2020

_____
*Judge's signature*

City and state:  Santa Barbara, California

HONORABLE LOUISE A. LAMOTHE
*Printed name and title*

AUSA: Kevin J. Butler

**AFFIDAVIT**

I, Garrett Fraser, being duly sworn, declare and state as
follows:

## I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal
complaint and arrest warrants against Timothy Kieth MOORE
("MOORE") and Jesse Daniel TALAUGON ("TALAUGON") for a violation
of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a
Controlled Substance.

2.   This affidavit is also made in support of an
application for a warrant to search the following digital
devices in the custody of San Luis Obispo County Sheriff's
office ("SLOCSO"), in San Luis Obispo, California,
(collectively, the "SUBJECT DEVICES") as described more fully in
Attachment A:

a.   Blue Samsung smart phone, Model SM-A102U, IMEI:
356272106536860("SUBJECT DEVICE 1").   SUBJECT DEVICE 1 was found
in a backpack inside TALAUGON's vehicle;

b.   Apple iPhone, Model A1634 with no sim card
("SUBJECT DEVICE 2").   SUBJECT DEVICE 2 was found in center
console of TALAUGON's vehicle;

c.   White Apple iPhone ("SUBJECT DEVICE 3").   SUBJECT
DEVICE 3 was found between the driver's seat and center console
of TALAUGON's vehicle;

d.   Blue Motorola smart phone with cracked screen
("SUBJECT DEVICE 4").   SUBJECT DEVICE 4 was found on Alyssa
Clason's person in TALAUGON's vehicle;

e.   Grey Samsung Galaxy Note 8, Model SM-N950U, IMEI: 352078090383951 ("SUBJECT DEVICE 5").  SUBJECT DEVICE 5 was found in center console of TALAUGON's vehicle.

f.   White and silver, "My Cloud Home" storage hard drive, serial number: WCC7K4NDJXEV ("SUBJECT DEVICE 6"). SUBJECT DEVICE 6 was found in MOORE's bedroom.

g.   Blue and black Seagate Game Drive for PS4 (hard drive), serial number: NZ0D3BAA ("SUBJECT DEVICE 7").  SUBJECT DEVICE 7 was found on top of desk in MOORE's bedroom;

h.   Silver Samsung smart phone, Model SM-N975U, IMEI: 359761100957046 ("SUBJECT DEVICE 8").  SUBJECT DEVICE 8 was found in driver's seat of MOORE's rental vehicle;

i.   Apple iPhone, Model A1522, IMEI# 354455061668974 ("SUBJECT DEVICE 9").  SUBJECT DEVICE 9 was found on Melanie EDGAR's person inside of MOORE's rental vehicle ("SUBJECT DEVICE 9").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances, 18 U.S.C. § 924(c) (Carrying, using, or possessing firearm in connection with drug trafficking), (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

2

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the United States, Homeland Security Investigations (HSI) and have been so employed since December of 2006. I attended a 23 week course at the Federal Law Enforcement Training Center and was trained in the aspects of conducting criminal investigations. While employed by HSI, I have investigated and participated in federal and state criminal investigations related to narcotics distribution, possession of drugs, gang investigations, money laundering, illegal firearms investigations and child exploitation. I have gained experience through training and everyday work relating to conducting these types of investigations and other types of investigations. I am presently assigned to the Office of the Assistant Special Agent in Charge, Ventura, California (HSI Ventura).

## III. SUMMARY OF PROBABLE CAUSE

6.    In late 2019, HSI Ventura received information from the SLOCSO that MOORE and TALAUGON were the heads of a Drug Trafficking Organization ("DTO") located in San Luis Obispo, CA.

Per historical text message conversations secured by SLOCSO via search warrants, HSI Ventura and SLOCSO discovered MOORE and TALAUGON had enlisted the help of individuals to smuggle drugs across the southwest border and were distributing narcotics in the San Luis Obispo County area.

7.   On February 19, 2020, the California Highway Patrol ("CHP") stopped a vehicle MOORE was driving in Santa Barbara County.  The traffic stop resulted in the seizure of several items including the following: approximately 1 kilogram of heroin, 1 kilogram of Fentanyl, 328 grams of fentanyl pills, approximately 360 grams of methamphetamine and a loaded firearm with an obliterated serial number, as well as several cell phones.  MOORE was arrested for California State narcotics and firearms violations.

8.   On February 20, 2020, SLOCSO stopped a car TALAUGON was driving pursuant to a California State search warrant for his vehicle and his person.  A search of his vehicle resulted in the seizure of several items including the following: approximately 1.2 kilograms of methamphetamine, .7 grams of heroin, 12.9 grams of a heroin/fentanyl mixture, 3.2 grams of a fentanyl, heroin, methamphetamine mixture, several cell phones, and approximately $2,000.  TALAUGON was charged with California State narcotics violations.

9.   On February 20, 2020, subsequent to the above mentioned traffic stops, SLOCSO deputies served a search warrant at MOORE and TALAUGON's residence located 193 South Street, San Luis Obispo, California.  The search resulted in the seizure

several items including the following: approximately 4.5 kilograms of methamphetamine, approximately 700 grams of heroin, two firearms, and two hard drives.

10.   SLOCSO Forensic Laboratory confirmed the above quantities of various narcotics.

### IV. STATEMENT OF PROBABLE CAUSE

11.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Identification of MOORE and TALAUGON as Source of Illegal Drugs**

12.   In late 2019, Law enforcement officers with the SLOCSO provided me with the following details regarding MOORE:

13.   On March 7, 2019, SLOCSO arrested James Shoneff and his girlfriend, Kristin Dejong for possession of methamphetamine and heroin for sales and transportation. Shoneff and Dejong were in possession of approximately 75.1 grams of methamphetamine and approximately 5 grams of heroin.  Based on Shoneff's probation status (which included specific electronic search terms), SLOCSO Detective Noah Arnold conducted an examination of Shoneff's cell phone for evidence related to narcotics distribution.

14.   The search of Shoneff's phone resulted in the discovery of several text messages regarding the sale of methamphetamine.  Shoneff had a text message conversation with a subject listed as "Bruh," using the phone number 405-472-0057 discussing the purchase of a half-pound of methamphetamine.

15.   Det. Arnold used a proprietary database that links individuals and property to phone numbers and addresses and determined that MOORE was associated with the telephone number 405-472-0057, listed as "Bruh."

16.   A search of MOORE's name and DOB in the California Law Enforcement Telecommunication System revealed that MOORE had a criminal history out of Kern County, California which included narcotics and weapon violations.

17.   A search of the California Department of Motor Vehicles revealed that MOORE listed an address at 2475 Sevanda Lane, Arroyo Grande, California. On March 18, 2019, SLOCSO deputies had responded to 2475 Sevada Lane (Arroyo Grande) and contacted MOORE at that address regarding a domestic dispute with his suspected wife Shawna Moore.

18.   A search of social media for MOORE's name in the San Luis Obispo County area resulted in the discovery of a Facebook page belonging to a "Kieth Moore" (www.facebook.com/kieth.moore.88). Det. Arnold conducted a comparison of MOORE's DMV photograph to the Facebook photos on that page and determined that they were a match.

19.   On August 5, 2019, SLOCSO Deputies responded to 2170 Branch Mill Road, Arroyo Grande, California for a report of a battery.  Upon SLOCSO's arrival, deputies observed a 2016 Honda Civic bearing California license plate number (CALP#) 7SWF017 exiting the driveway of the residence.  SLOCSO deputies suspected that the subjects inside of the Civic were related to the battery call and conducted a traffic stop of the vehicle.

The three occupants of the vehicle were identified as MOORE (Driver), Claudia Ritter (front passenger) and Michael Hooper (rear passenger). At that time, Hooper was on active Post Release Community Supervision ("PRCS") out of Kern County, California.

20. Based on Hooper's PRCS terms, SLOCSO conducted a search of a backpack that was on the rear passenger floorboard of the Civic. Inside the backpack, deputies located approximately one pound of methamphetamine. SLOCSO deputies arrested Hooper for possession of methamphetamine for sale. Per the SLOCSO incident report, MOORE was interviewed and provided three phone numbers which included cell phone number 805-574-5479. SLOCSO subsequently released MOORE and Ritter. Hooper later pled no contest to possession of a controlled substance for sale.

21. Subsequently, Det. Arnold provided me with MOORE's name and DOB. I used the Treasury Enforcement Communications System ("TECS") and conducted a search of border crossing records for MOORE's name and date of birth. The search revealed that on August 4, 2019, MOORE had crossed from Mexico into the United States via the pedestrian crossing at the Otay Mesa Port of Entry ("POE") and that from July of 2019 through November 2019, MOORE had crossed into the United States from Mexico approximately 14 times via the southwest land border. Records also show that on October 21, 2019, MOORE and TALAUGON crossed inbound from Mexico into the United States via the vehicle crossing at the San Ysidro Port of Entry. Both crossed in a

white Dodge Ram bearing California License Plate #59318X1
registered to MOORE.

22.   A TECS search for border crossing records of
California license plate number 7SWF017 revealed that on August
4, 2019, a Cory Hernandez crossed the San Ysidro POE from Mexico
into the United States driving the Honda Civic, bearing license
plate number 7SWF017. It should also be noted that August 4,
2019, that Honda Civic crossed into Mexico at the Otay Mesa POE.

23.   On October 4, 2019, Det. Arnold learned that Scott
Jackson, a wanted PRCS absconder, had been arrested in Cambria,
California for state weapons and narcotics violations.  As a
result of that arrest Det. Arnold was able to review the
contents of Jackson's cell phone, pursuant to Jackson's fourth
amendment waiver search terms, as well as electronic search
terms pursuant to California Penal Code § 1546.1(c)(9).

24.   Det. Arnold reviewed JACKSON's cell phone contacts and
found one contact listed as "Keith" with a cell phone number of
805-574-4672.  Det. Arnold used law enforcement databases and
learned that cell phone number 805-574-4672 was also associated
with MOORE.  Det. Arnold found text messages between Jackson and
"Keith" regarding narcotics sales activity.

25.   On November 3, 2019, MOORE was arrested by Sheriff's
deputies for violating a restraining order.  Det. Arnold
reviewed MOORE's booking information and MOORE provided three
phone numbers in that information including previously listed
phone number of 805-574-5479.

26.   On November 7, 2019, a SLOCSO undercover operator using an undercover Facebook account, contacted MOORE via his Facebook account profile.   MOORE provided the UCO with his phone number "805-295-1079."

27.   Det. Arnold then secured a California State Search Warrant signed by the Honorable Tim Covello of the Superior Court of the San Luis Obispo County, California for MOORE's phone numbers (elicited below):

805-574-4672

805 574-5479

805-295-1079

28.   On November 13, 2019, Det. Arnold received digital records related to the above phone numbers as a return for the search warrant.   The return included subscriber information, cell phone tower pings, estimated location pings, call logs, text logs, text message content, and picture messages.

29.   The search warrant return information confirmed that the phone numbers ending in 4672 and 5479 were subscribed by MOORE.   I later learned from the search warrant return information that Verizon Wireless stated to contact Charter Communications for subscriber information for phone number 805-295-1079.   I sent a subpoena to Charter Communications for subscriber information for 805-295-1079 and on February 13, 2020, Charter Communications responded to the subpoena stating that Timothy Moore or Timothey Moore was the subscriber with an address of 193 South Street, San Luis Obispo, California 93401, and a Billing Address of 1710 Huasna Drive, San Luis Obispo,

California 93405, as well as an email address of
KiethMoore88@hotmail.com, and a contact phone number of 805-574-
4672.

30.   Analysis of the historical text message content from
phone number 805-295-1079 found that MOORE was communicating
with a subject later identified as TALAUGON utilizing phone
number 805-260-4115 regarding perspective narcotics
transactions. The following is a synopsis of the text messages:

31.   On or around November 5, 2019, MOORE (phone number
805-295-1079) and TALAUGON (805-260-4115) had various text
message conversations; in those text conversations MOORE who
appears to be in Mexico at that time, instructs TALAUGON to send
a female later identified as Courtney Kendrick across the border
into Mexico.   Per those text messages, it appears that TALAUGON
facilitates Kendrick's crossing into Mexico for the purpose of
Kendrick smuggling narcotics back across the border into the
United States.   MOORE and TALAUGON also had other numerous text
message conversations regarding their perspective narcotics
activities which included how they were going to pay for the
narcotics and how much money they were going to make from
selling the narcotics.

32.   Per SLOCSO Gang Task Force Det. Kevin Norris, TALAUGON
is a documented member of the SICK BOYS criminal street gang
operating out of San Luis Obispo County.   TALAUGON's criminal
history includes several narcotics related arrests and a
conviction for Possession for Sale of a Controlled Substance.

33.   Det. Arnold provided me with Courtney Kendrick's name and date of birth based off the text messages sent between MOORE and TALAUGON and a previously monitored/recorded SLOCSO jail call between MOORE and a bail bondsman.  During that jail call MOORE provided the bail bondsman with Kendrick's first name and her phone number "805-635-1216."  Det. Arnold used departmental resources to search that phone number and found that it was associated with Kendrick.  Kendrick had also been previously identified in another unrelated SLOCSO narcotics investigation utilizing that same phone number.

34.   I conducted a search of TECS with Kendrick's name and date of birth, and found that on November 6, 2019, Kendrick was arrested by HSI San Ysidro for attempting to smuggle approximately 11 ounces of heroin concealed on her person (internal body carry).  Kendrick is currently in federal judicial process in the Southern District of California related to that crime.

35.   Per the previously mentioned search warrant return information, on November 8, 2019, MOORE -- using phone number 805-295-1079 -- and an unidentified person using a Mexican phone number (0115216642338758/herein after MX8758) who appears to be a source of supply for narcotics in Mexico, had a text message conversation regarding Kendrick.  MOORE had asked MX8758 where Courtney was at and MX8768 replied that she was arrested and that MOORE needed to be careful.

36.   On November 5, 2019, MOORE using 805-279-1095 phone number had a text message conversation with another subject

suspected to be Tonya Goodson.  MOORE texted that he needed to find a "Shawna dallerie" and followed up with, "From northern county she crossed they said she got busted but she made itl."

37.  Det. Arnold then used SLOCSO resources to search for "Shawna Dallerie."  The query resulted in the discovery of a Dallaire residing in the northern area of San Luis Obispo     I County.conducted a query of Dallaire's name and DOB in TECS and found that on October 30, 2019, HSI San Ysidro arrested DALLAIRE with approximately 38 pounds of methamphetamine hidden in her vehicle.

38.  SLOCSO detectives secured several subsequent search warrants for MOORE's 805-295-1079 phone number and TALAUGON's 805-260-4115 phone number.  The following are subsequent search warrants issued out of the Superior Court of San Luis Obispo County for those phone numbers:

> Warrant #13496, authored by Detective Noah Arnold, signed by the Honorable Judge Michael Duffy for phone record information and content.
> Warrant #13563, authored by Detective Jon Penaflor, signed by the Honorable Judge Dodie Harman for phone record information and cell phone "ping order."
> Warrant #13605, authored by Detective Penaflor, signed by the Honorable Judge Timothy Covello for phone record information and content.
> Warrant #13641, authored by Detective Penaflor, signed by the Honorable Judge Jesse Marino for phone record information and a cell phone " ping order."

39.   The return information in the above listed warrants showed that MOORE and TALAUGON were continuing their narcotics distribution activities in San Luis Obispo County, California.

40.   On January 26, 2020, Det. Arnold secured a Search Warrant, signed by the Honorable Judge Jacquelyn Duffy for Facebook information from MOORE's Facebook account: https://www.facebook.com/kieth.moore.88).

41.   On January 29, 2020, Det. Arnold received the search warrant return of MOORE's Facebook account.  This information included account information, photographs (profile pictures and mobile uploads), and Facebook messenger content.  The following is MOORE's Facebook account information received from Facebook:

42.   The return information from the Facebook showed that MOORE provided the following Phone Numbers:

+18055745479 Cell Verified on 2019-05-22

+18052951079 Cell Verified on 2019-10-11

43.   Per Facebook, the above phone numbers were provided by the account holder and were verified via a response from the account holder via a text sent from Facebook to the listed phone numbers.  The search warrant return information also showed several conversations with several different individuals regarding MOORE's narcotics distribution activities.  It also showed that MOORE was in contact with Dallaire and Kendrick via Facebook Messenger around the time both were arrested.

44.   On or around February 13, 2020, Det. Arnold secured a California search warrant #13672 from the Honorable Craig Van Rooyen.  The warrant authorized the search of MOORE and

TALAUGON's residence located at 193 South Street, San Luis Obispo, California, several vehicles associated with MOORE and TALAUGON, and for the persons of MOORE, TALAUGON, and a Shane Carter, who SLOCSO believes may be involved in the manufacturing of untraceable firearms with MOORE.

**B.   Traffic Stops of MOORE and TALAUGON and Search Warrant Executed at MOORE and TALAUGON's Residence**

45.   On February 18, 2020, per a previously installed SLOCSO surveillance camera, SLOCSO members observed MOORE departing the residence at 193 South Street address and entering a white Cadillac SUV. MOORE then departed the area, driving westbound on South Street.

46.   SLOCSO members monitored the cell phone GPS ping of MOORE's location as he traveled from San Luis Obispo to San Diego. MOORE appeared to visit numerous areas in San Diego, California. MOORE then drove to the Los Angeles area, traveling into Covina and El Monte areas.

47.   On February 19, 2020, per the GPS ping analysis MOORE began to travel northbound from Los Angeles on Highway 101.

48.   SLOCSO Detectives then initiated surveillance of Highway 154 in Santa Barbara County in order serve search warrant #13672 on MOORE. At that time, Det. John Penaflor contacted CHP K-9 Officer Julie Jensen and enlisted her assistance in stopping and searching MOORE.

49.   MOORE then arrived in Santa Barbara and began traveling on Highway 154.

50.   Eventually, SLOCSO Det. Norris observed a white
Cadillac SUV bearing California License Plate number 8NDA344
traveling North on Highway 154 to the Highway 101 interchange.
Det. Norris observed MOORE in the driver's seat of the Cadillac
SUV as he initiated surveillance of MOORE.

51.   Officer Jensen along with CHP Officer Kevin Taulbee
located the Cadillac while driving northbound on Highway 101,
north of Palmer Road in Santa Barbara County.   CHP Officers
conducted a traffic stop on the Cadillac on Highway 101 at
Solomon Summit Road for exceeding 65 miles per hour in violation
of the CA Vehicle Code 22349(a).

52.   Officer Taulbee contacted MOORE and a female later
identified as Melanie Edgar from the passenger side of the
Cadillac.   MOORE's identity was confirmed after providing his CA
Driver's License.   Officer Jensen asked MOORE to step outside of
the vehicle.   MOORE stated that he works in Los Angeles as an
electrician for UPS.   MOORE stated that he was not coming from
work in Los Angeles, but from Santa Barbara.   MOORE stated that
he was driving a vehicle he rented and was to return the vehicle
on Saturday.

53.   MOORE stated that Edgar was a friend.   Officer Jensen
then walked to Edgar to gather her identifying information.
Edgar stated that she did not have a driver's license with her.
Officer Jensen observed a cell phone on Edgar's lap and asked if
Edgar had social media accounts on her cell phone which had
Edgar's name.   Edgar stated that she did not have social media
but that her name was "Kaylie Edgar" and provided here date of
birth.

Officer Jensen told Edgar that people often give her other people's names to hide their identities. When asked for her address, Edgar had trouble remembering her address, and eventually provided Officer Jensen with a California driver's license. Edgar's driver's license identified her as Melanie Edgar. CHP Officers discovered that Edgar was on state parole. Edgar exited the vehicle and was placed in a CHP patrol car.

54. MOORE stated that he was not aware that Edgar was on parole. Officer Jensen then asked MOORE if there was anything illegal, or guns or an excessive amount of money over $200 in the Cadillac. MOORE stated there was not. MOORE stated he had approximately $1,500 in his pocket. When asked if there was any methamphetamine in the vehicle, MOORE said no. MOORE was then asked if there was any heroin, marijuana or prescription pills, to which he replied no. When asked if he was okay with Officer Jensen searching his car, he said no and then stated that Officer Jensen could search the vehicle and asked the reason for the search. Officer Jensen stated that Edgar was on parole and Officer Jensen could search anyway but wanted his permission. MOORE stated that there was a pipe and bong in the vehicle. MOORE stated that there was a pocket knife in the vehicle, but no guns.

55. Officer Jensen then retrieved her Police Service Dog, K-9 Edy, who is a certified detection canine. Edy is trained to alert to the odors of marijuana, methamphetamine, cocaine and heroin. A K9 sniff was conducted on the exterior of the Cadillac, working in a counter-clockwise manner, starting from

16

the right front portion of the vehicle. Edy alerted to narcotics odor on the quarter panel adjacent to the hood, near the driver's door, at the seam at the B pillar between the driver's door and left rear passenger door, the trunk door, and near the right front passenger door.

56. At this point, MOORE had given his consent to search the vehicle, EDGAR was confirmed to be on parole, Det. Arnold had procured search warrant (#13672) to search any vehicle operated by MOORE, and K9 Edy had alerted to the odor of narcotics in the Cadillac.

57. Prior to a K9 sniff of the inside of the vehicle, an initial physical search was conducted by Officer Jensen who discovered a digital scale in the center console, and a coin purse containing a folded piece of foil with a substance later discovered to be fentanyl. In the rear passenger and trunk area of the vehicle Officer Jensen discovered a bong, a used methamphetamine pipe, a large torch type lighter, an empty gun safe, an empty black pelican type case, a box of gallon sized Ziplock bags, several laptop computers and several other personal effects. Under the driver's seat was a game camera and a Florida License Plate. In the driver's side door panel was a used methamphetamine glass pipe.

58. Officer Jensen then retrieved K9 Edy to conduct an interior sniff of the Cadillac. Edy alerted to narcotics odor in the front passenger area at the right front floorboard, the right front A Pillar, under the dash area, the pockets of the driver side door, the left front A pillar and under the dash.

59.  Officer Jensen then began a physical search of the interior vehicle where Edy alerted.  Under the driver's side dash, hidden in the dash area was a brown wrapped package in a gallon sized freezer bag (later determined to be fentanyl), and a bag filled with pills (later determined to contain fentanyl). Once the pills were pulled out, Officer Jensen observed the butt of a semi-automatic Glock handgun.  Once removed, Officer Jensen observed that the serial number had been intentionally ground off.  Officer Jensen removed a high capacity magazine from the Glock and found the handgun was loaded with one round in the chamber and rounds in the magazine.

60.  Officer Taulbee searched the front passenger side of the Cadillac under the dash and observed another bag of pills (later determined to be fentanyl).  Officer Jensen removed the bag of pills from under the dash and discovered a clear gallon sized freezer type bag later determined to be methamphetamine.

61.  Officer Jensen conducted a search of the engine compartment of the Cadillac and discovered a large oblong vacuumed sealed package later determined to contain heroin.  CHP Officer Hall discovered 25 packages of Suboxone wrapped in a rubber band, 103 Twenty-Dollar bills ($2,060) were discovered in MOORE's left front pocket.

62.  MOORE was arrested for being in possession of narcotics and a firearm.  MOORE was read his Miranda Rights, and indicated he understood his rights.  Edgar was arrested for violating her parole and for being in possession of narcotics.

The Cadillac was towed by Four Corners Towing and stored at 519 South Oakley Street, Santa Maria, California.

63. MOORE and Edgar were booked at the Santa Barbara area CHP Office.

64. MOORE was booked for the following violations of the Possession of Methamphetamine; Transportation of Methamphetamine for Sale; Transportation of a Controlled Substance; and Possession of a Controlled Substance while Armed.

65. Edgar was booked for parole violation and Possession of a Controlled Substance.

66. Edgar was asked for her phone number, she stated she did not have one, and that her cell phone only worked using WIFI. Edgar stated she uses her father's cell phone number and provided it to Officer Jensen. Edgar stated that she had just met MOORE through a friend on Facebook and MOORE was giving her a ride to San Luis Obispo. Edgar stated that the substance found wrapped in foil was a pill she had cut up, then blurted out, "it's fentanyl," and that she got it from a friend the night prior. Edgar stated that she was coming down from fentanyl. Edgar asked why MOORE couldn't take the rap for everything because it was his.

67. While being transported to county jail, MOORE asked, "who turned me in?"

68. CHP seized .72 grams of suspected fentanyl from Edgar and Apple iPhone Model A1522 (IMEI #354455061668974) Discovered on Edgar's lap ("SUBJECT DEVICE 9"). SUBJECT DEVICE 9 was subsequently turned over SLOCSO.

69.   CHP seized several items including the following items from MOORE and the Cadillac which were booked as evidence at the Santa Barbara area CHP office.   These items were later turned over to the SLOCSO.   The SLOCSO Forensic Laboratory conducted tests on all the below listed drugs, the results are listed below:

     a.    103 $20 bills;

     b.    Florida License Plate #G 1316K;

     c.    Oxycontin pills in zip lock baggy 97.7 Grams Discovered under driver's side dash of Cadillac behind carpet. Later determined to be 95.9 grams of fentanyl and acetaminophen pills;

     d.    Presumed methamphetamine in brown wrapping within a freezer bag - 1072.2 gross grams, discovered under driver's side dash of Cadillac next to pills and Glock handgun.  Later determined to be 1,027.6 grams of fentanyl;

     e.    A loaded Glock Handgun .40 Caliber with the serial number obliterated and a seated high capacity magazine discovered under the driver's side dash of Cadillac;

     f.    Methamphetamine in freezer bag - 335 grams, discovered under passenger front dash area of Cadillac, behind the carpet.  Later determined to be 324.7 grams of methamphetamine;

     g.    Oxycontin Pills in plastic bag - 115.4 grams,

discovered under passenger side of dash, behind

the carpet. Later determined to be 113.84 grams

of fentanyl and acetaminophen pills;

h.   25 packets Suboxone, discovered in center console

of Cadillac;

i.   Presumed heroin or fentanyl, vacuum sealed bag –

1,046.7 grams discovered under hood on driver's

side of the Cadillac. Later determined to be

1003.0 grams of heroin (diacetylmorphine);

k.   Silver Samsung smart phone, Model SM-N975U, IMEI:

359761100957046 found in the driver' seat of

MOORE's rental vehicle ("SUBJECT DEVICE 8"). Per

CHP Officer Jensen this phone was wedged in

between the driver seat cushion and seat back.

70.   SLOCSO Detectives and uniformed deputies then began
surveillance at the 193 South Street address.

71.   On January 20, 2020, Detective Jones observed a black
BMW, California license plate #6GZZ304, leaving the residence.
The vehicle was registered to TALAUGON and TALAUGON had been
previously observed driving this vehicle. The vehicle exited
the residence, heading south on South Street, towards Broad
Street.

72.   SLOCSO Deputies Hank Abbas, Jessica Garcia-Millar,
Mark Lewis, and Jeremy Flores initiated a traffic stop on the
vehicle in order to effect service of search warrant #13672.
Inside the vehicle deputies contacted TALAUGON who was driving

the vehicle, and female passenger identified as Alyssa Clason
who was subsequently released at the scene.

73.  SLOCSO Deputies searched the vehicle per warrant
#13672 and seized approximately 1,002 grams of methamphetamine,
approximately .7 grams of heroin, approximately 12.9 grams of a
fentanyl/heroin mixture, 3.2 grams of a
methamphetamine/heroin/fentanyl mixture and approximately .51
grams of fentanyl.  The SLOCSO Forensic Laboratory conducted
tests on the drugs found in TALAUGON's vehicle.  The results are
as listed above.  SLOCSO also seized several other items from
TALAUGON's vehicle including the following items:

> a.  Numerous sandwich baggies(narcotic
>     packaging).
>
> b.  Operational black digital scale with suspected
>     methamphetamine residue.
>
> c.  Blue Samsung smart phone, Model SM-A102U, IMEI:
>     356272106536860, found in a backpack inside
>     TALAUGON's vehicle. ("SUBJECT DEVICE 1");
>
> d.  Apple iPhone, Model A1634 with no sim card found
>     in center console of TALAUGON's vehicle ("SUBJECT
>     DEVICE 2");
>
> e.  White Apple iPhone, found between driver's seat
>     and center console of TALAUGON's vehicle
>     ("SUBJECT DEVICE 3")
>
> f.  Blue Motorola smart phone with cracked screen
>     found on Alyssa Clason's person in TALAUGON's
>     vehicle ("SUBJECT DEVICE 4")

g.  Grey Samsung Galaxy Note 8, Model SM-N950U, IMEI: 352078090383951, found in center console of TALAUGON's vehicle ("SUBJECT DEVICE 5").

h.  Chase bank envelope containing $2,020 in US Currency found in a backpack in the rear seat of TALAUGON's vehicle.

74.  All the above listed items were seized and secured at the SLOCSO Office and booked into evidence.

75.  At approximately 02:54 hours, SLOCSO Detectives served search warrant #13672 at the residence located at 193 South Street.  No additional subjects were encountered during search warrant service.  SLOCSO then conducted a hand search of the residence and seized several items.  The following items were seized from a bedroom identified as TALAUGON's bedroom based on indicia with TALAUGON's name found in the bedroom:

a.  Approximately 239.6 grams of methamphetamine;

b.  Approximately .51 grams of fentanyl;

c.  Approximately 2.4 grams of heroin;

d.  Approximately .49 grams of MDMA;

e.  Approximately 3.3 grams of methamphetamine/cocaine mixture;

f.  A Smith and Wesson 9mm handgun with a seated magazine containing seven 9mm rounds;

g.  Operational silver/black digital scale with suspected heroin residue;

h.  Smith and Wesson M&P 9mm magazine with three 9mm rounds inside of a black magazine pouch;

     i.   Operational Supreme Weigh digital scale with suspected methamphetamine residue and heroin residue;

     j.   Large white Cen-Tech operational digital scale with suspected heroin residue;

     k.   Numerous plastic Ziploc baggies of differing sizes and styles;

     l.   Narcotics Pay and Owe sheets.

76.  SLOCSO identified MOORE's room based on the indicia which was located in the bedroom.  During the search of MOORE's room SLOCSO Detectives found the following items: a box of plastic sandwich baggies believed to be used for narcotics packaging on top of the bed, a "My Cloud Home" storage hard drive("SUBJECT DEVICE 6"), Blue and black Seagate Game Drive for PS4 found on top of a desk ("SUBJECT DEVICE 7"), Timothy Moore auto sales sticker attached to bedroom mirror and Indicia in MOORE's name inside of a unsecured safe.

77.  A hand search of the garage revealed a Black unassembled 9mm small frame handgun with a threaded barrel.  The unassembled firearm was in a box marked "SS80."  This unassembled firearm is considered a "ghost gun" with no serial number.  These types of firearms are purchased as a kit and have to be completed or finished by the end user to become a firearm. This was located in a box on a table on the southern side of the garage near a floor safe.  The floor safe was installed in the concrete floor of the garage.  The following items were seized from inside the garage floor safe:

    a.   9 cylindrical shaped plastic wrapped packages containing a total of approximately 4,195.2 grams of methamphetamine;

    b.   700 grams of a grey powder substance (later determined to be heroin) contained inside multiple Ziploc gallon bags; the substance inside was pressed into a form consistent with a kilogram brick with a portion of it missing;

    c.   Operational Weighmax scale with suspected heroin and suspected methamphetamine residue.

78.   It should also be noted that in the garage near the safe and unassembled handgun was a white 1966 Ford Mustang bearing CALP# 8MYV743 registered to MOORE.  A check of TECS for the Mustang's license plate revealed that on December 17, 2019, MOORE crossed inbound from Mexico to United States at the San Ysidro POE driving that Mustang.

79.   Prior the execution of the search warrant at the 193 South Street address, SLOCSO Det. Ian Doughty reviewed search warrant return information (#13605) for text message content on MOORE's 805-295-1079 phone number and found text messages sent by MOORE on January 12, 2020 to an unidentified subject.  MOORE texted what appeared to be instructions and a three number combination to open a safe.  Det. Doughty utilized that combination and instructions and was able to open the safe in the garage that contained the above listed drugs.

80.   A third bedroom/office was also searched inside the residence.  The following items were seized from that room:

    a.    Approximately 97.9 grams of methamphetamine in plastic tie off, located in desk drawer of computer desk;

    b.    Two suspected counterfeit U.S. $100 dollar bills, located in desk shelf of computer desk;

    c.    Numerous fraudulent California Driver Licenses CDL) and documents, several in the name of Shane Carter, located on a large table in office.

81.   In the kitchen of the residence SLOCSO detectives found a plastic kilogram wrapping with brown residue and second plastic wrapping with dark residue in the dining room trash can.

82.   In the living room of the residence SLOCSO deputies seized a Large Operational Optima digital scale which was located on a lower television stand shelf.

83.   All the seized narcotics listed in this affidavit were tested by the SLOCSO Forensic Laboratory, in San Luis Obispo, California. All the listed narcotics and weights in this affidavit are based on the test results from the SLOCSO Forensic Laboratory.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

84.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug

traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their

27

digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

85.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

86.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

28

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    87.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a short period of time for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

88.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MOORE's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MOORE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

89.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  CONCLUSION

90.  For all of the reasons described above, there is probable cause to believe that MOORE and TALAUGON have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A

Garrett Fraser, Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this 16th day of March, 2020.

UNITED STATES MAGISTRATE JUDGE